UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PATRICIA ANNE ANTOSH,

                 Plaintiff,

-vs-                               DECISION AND ORDER

CAROLYN W COLVIN,                      16-CV-6101-CJS
  *Acting Commissioner of Social Security*,

                 Defendant.

## APPEARANCES

For Plaintiff:                        Kenneth R. Hiller, Esq.
                                       Justin M. Goldstein, Esq.
                                       Law Offices of Kenneth Hiller, PPLC
                                       6000 North Bailey Avenue Suite 1A
                                       Amherst, NY 14226
                                       (716) 564-3288

For Defendant:                     Emily Maxine Fishman, Esq.
                                       Social Security Administration
                                       Office of General Counsel
                                       26 Federal Plaza Room 3904
                                       New York, NY 10278
                                       (212) 264-2644

                                       Kathryn L. Smith, A.U.S.A.
                                       United States Attorney's Office
                                       100 State Street, Fifth Floor
                                       Rochester, NY 14614
                                       (585) 263-6760

## INTRODUCTION

    **Siragusa, J.** This case is before the Court on cross-motions for a judgment on the pleadings. Pl.'s Notice of Motion, Oct. 31, 2016, ECF No. 11; Def.'s Notice of Motion, Dec. 1, 2016, ECF No. 12. Plaintiff seeks reversal of the Commissioner's decision denying disability

insurance benefits to her. After reviewing the papers and hearing oral argument, the Court grants Plaintiff's motion, in part, and denies the Commissioner's application.

## BACKGROUND

Plaintiff applied for supplemental security income benefits on December 12, 2012. She alleged that her disability began on May 11, 1968.[1] R. 149–55. The Commissioner administratively denied her application on June 7, 2013, and she requested, and was granted, a hearing before an Administrative Law Judge ("ALJ") via video teleconference on August 5, 2014. R. 65–70, 82–84. Following the hearing, the ALJ denied benefits. R. 10–20. The ALJ's denial became the final decision of the Commissioner when, on December 23, 2015, the Appeals Counsel denied Plaintiff's request for review. R. 1–5. She filed this action on February 19, 2016. Compl., ECF No. 1.

*Vocational Background*

At the time of her application for benefits, Plaintiff was 44 years old. R. 18. She has a high school education, as well as two years of college (completed in 1989), and is able to communicate in English. R. 19, 178. She testified she has two Associate's degrees, one in hotel and hospitality, and the other in computer programming. R. 31. She reported working as a cashier at a grocery store from 1986 until 1988, working as a nurse's aide in a nursing home from 1990 until 1992, and working in customer service in the medical field from 2004 until 2008. R. 178. She reported she stopped working on February 1, 2008, because of her condition. R. 177.

*Medical History*

Plaintiff listed fourteen medications on her Disability Report (undated). R. 180. The medications treat anxiety, bipolar disorder, irritable bowel syndrome, depression, migraines,

---

[1] In her application, Plaintiff puzzlingly wrote that her date of birth and the date her disability began were both May 11, 1968, but that she "was not disabled prior to age 22." R. 149.

nausea, cholesterol, asthma, pain and mental illness. *Id*. She alleges disability based on bi-polar disorder, depressive disorder, asthma disorder, allergic rhinitis, migraine disorder, plantar fasciitis and calcaneal spurs, arthritis, osteoporosis, fibromyalgia, irritable bowel syndrome and osteoarthritis. R. 177, 220–21.

## STANDARD OF LAW

The pertinent statute states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (citations omitted).

ANALYSIS

Plaintiff argues that the ALJ's residual functional capacity ("RFC") findings, both mental and physical, are not supported by substantial evidence and are inconsistent with legal standards, and that the ALJ failed to evaluate Plaintiff's credibility pursuant to appropriate legal standards.

*Mental Residual Functional Capacity*

Plaintiff takes issue with the ALJ's mental RFC determination. The ALJ found that Plaintiff had the mental capacity to perform "simple, routine, and repetitive tasks in an environment free of fast-paced production requirements with only occasional workplace changes and occasional decision-making and having only occasional contact with the public, co-workers and supervisors." R. 17. Plaintiff remarks in her memorandum of law that "the ALJ ignores that the only medical opinions from examining sources contain limitations far more limiting than the ALJ's RFC finding," and argues that "the ALJ's explanation for her RFC finding clearly shows that the ALJ relied upon her own lay interpretation of the treatment notes over the medical opinions," concluding that the ALJ thereby committed legal error. Pl.'s Mem. 17. The Commissioner relies on the report of R. Nobel, Ph.D., which Plaintiff notes was filed before "the two opinions of the examining and treating sources submitted after Dr. Nobel's review of the record . . . ." Pl.'s Reply Mem. 5.

On March 28, 2013, Kavitha Finnity, Ph.D., examined Plaintiff for the Monroe County Department of Social Services and completed a psychological and intellectual assessment for determination of employability. R. 475–80. Dr. Finnity determined that Plaintiff "is unable to participate in any activities except treatment or rehatilibition…" for an expected duration of six months. Dr. Finnity did *not* check the box on this form report indicating that

4

"[i]ndividual appears permanently disabled, condition is not expected to improve, and is unable to participate in any activities. SSI referral is recommended based on:."

Mehrunnisa Sultana, M.D., of the Jerome Golden Center for Behavioral Health in West Palm Beach, Florida, signed a progress note on January 18, 2013, after examining Plaintiff at 3:00 A.M. as a psychiatry outpatient. The doctor noted that Plaintiff was,

> feeling anxious, depressed, overwhelmed. She does not have job and she has a 21 yr old son who is unable to take care of himself.
>
> Ps states that she can not leave the house for most days. Ps states that she cries all of the time for no reason. Ps states that she has anxiety and trouble sleeping.
>
> Ps appears tearful on and off throughout the interview. Ps is oriented X3 and spoke when cued. Ps affect was congruent with mood and presents with fair insight. Ps' thought process was logical and eye contact was very appropriate. Ps' hygiene was good and seemed to have proper attire for the interview.

R. 426. Dr. Sultana diagnosed the following:

> DIAGNOSIS
>
> Axis 1: Posttraumatic Stress Disorder (309.81), Anxiety Disorder NOS (300.00), Depressive Disorder NOS 0, Comments: R/O Anxiety with agoraphobia.
>
> Axis 2: Diagnosis Deferred (799.9).
>
> Axis 3: DX DEFERRED (799.9)
>
> Axis 4: relationship problems
>
> Axis 5: GAF: 50 :Past Year GAF: 55. Substantiating Behaviors for Diagnosis/ Comments: Isolative, Cocaine dependence, Depressed mood.

R. 426. Dr. Sultana's plan was to restart Plaintiff on medication.

Dr. Nobel filed a report dated June 6, 2013, and titled Disability Determination Explanation. R. 53–63. He based his determination on a review of Plaintiff's medical records, as outlined in the report. R. 54. One portion of the report, titled Residual Functional Capacity, noted a limitation in Plaintiff's ability to engage in sustained concentration and exhibit

persistence. R. 59. Dr. Nobel noted moderate limitations in the following areas: the ability to carry out detailed instructions, and maintain attention and concentration for extended periods; the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to respond appropriately to changes in the work setting. R. 59–60. Nevertheless, Dr. Nobel concluded that the Plaintiff could "understand, retain, and carry out simple instructions . . . consistently and usefully perform routine tasks on a sustained basis, with normal supervision, and can cooperate effectively with public and co-workers in completing simple tasks and transactions… [and] adjust to the mental demands of most new task settings." R. 61. Dr. Nobel noted in the report that Plaintiff, "when on medication and sober, . . . has consistently assessed as mildly to moderately rather than markedly impaired." R. 59.

On September 20, 2013, Plaintiff was seen by Jennifer Farah Agor, LCSW,[2] at the University of Rochester Medical Center. R. 519. The record of the visit shows that Ms. Agor set up a treatment plan, signed on November 4, 2013, for Plaintiff with Marilyn Guadagnino, MTBC, LCAT,[3] of the Monroe County Department of Human Services and psychiatrist Melissa Desa, M.D. R. 526. An addendum to the plan was signed by Dr. Desa on February 4, 2014. R. 536.

---

[2] Presumably "licensed clinical social worker." *See Maldonado v. Berryhill*, No. 16-CV-165 (JLC), 2017 U.S. Dist. LEXIS 34782, *22 (S.D.N.Y. Mar. 10, 2017).

[3] These initials are not explained on the assessment form. R. 466. On a website advertising Ms. Guadagnino's practice, the letters LCAT are explained as Licensed Creative Arts Therapist. Psychology Today Therapists, New York, Rochester, Marilyn Sydlo Guadagnino (https://therapists.psychologytoday.com/rms/name/Marilyn_Sydlo_Guadagnino_MTBC,LCAT_Rochester_New+York_170772) last visited March 21, 2017. In addition, Ms. Guadagnino's own website also lists her as a "Board Certified Music Therapist with 26 years experience working in both hospital and community mental health settings…." Living Stress Free® Psychotherapy, Counseling and Wellness Coaching (http://livingstressfree.org/?l=t&pageStewardLink=11421) last visited March 21, 2017.

On March 11, 2014, Ms. Guadagnino completed a Psychological Assessment for Determination of Employability. R. 463–66. Ms. Guadagnino noted that Plaintiff has had, "[m]ental health issues since adolescence. Four psychiatric admissions in Florida 2004–2010. Mental health outpatient care in Florida. Moved to Rochester March 2013."R. 463. Plaintiff received psychotherapy every two weeks with Ms. Guadagnino and attended Venture PROS[4] four days per week. R. 464. Ms. Guadagnino reported that Plaintiff exhibited excessive verbalization, a sad affect, anxious mood, tense body posture, circumstantial thought process, intact judgment and impulse control, fair insight, and was moderately limited in the capacity to perform simple and complex tasks independently. R. 464–65. She also noted that Plaintiff's behavior interfered with activities of daily living. R. 464. The diagnosis noted[5] in Ms. Guadagnino's report were:

Axis I:   Bipolar disorder NOS 296.8, Posttraumatic stress disorder 309.81, Cocaine abuse 305.6.

Axis II:  Borderline personality disorder 301.83.

Axis III: IBS, asthma, seizure disorder, fibromyalgia, chronic [illegible].

Axis IV: Mental discord, economic problems, family discord, functional decline, interpersonal relationship problems.

Axis V:  50.

R. 465. Ms. Guadagnino concluded that Plaintiff, "appears permanently disabled, condition is not expected to improve, and is unable to participate in any activities. SSI referral is based on chronic symptoms from several of her diagnoses infereres [sic] with ability to function effectively." R. 466.

---

[4] "Venture PROS" is not explained on this record. R. 464. However, in a letter from James M. Redmond to Judge Julia Gibbs in Alexandria, Virginia, the program is referred to as Personalized Recovery Oriented Services through Genesee Mental Health Center. R. 220.

[5] The pre-printed language in this section of the report states, *inter alia*, that it "[m]ust be completed by Psychiatrist or Psychologist." R. 465.

Plaintiff testified at the August 5, 2014, hearing before the ALJ that she "never really went to see therapists before or psychiatrists before on a regular basis until you know, the last year or so. I mean, I really was in denial." R. 27, 35.

The ALJ relied on Dr. Nobel's report to determine that Plaintiff had only mild to moderate limitations, as detailed above. Dr. Nobel did not evaluate or treat Plaintiff, and his review was necessarily limited to records in existence prior to June 2013. Records submitted after that date, including Ms. Guadagnino's and Dr. Desa's, are not addressed in Dr. Nobel's report.

The ALJ did consider Ms. Guadagnino's report as a non-acceptable medical source, and assigned some weight to it. R. 17. The ALJ concluded that nothing in the progress therapy notes indicated that "the claimant's mental health symptoms were so severe that they would preclude her from performing some work within her mental residual functional capacity." R. 17. In addition, the ALJ determined that when Plaintiff "was complainant with her medication and mental health treatment,…her acute symptoms went away and she resumed a mental status within normal limits." R. 18.

Plaintiff contends that the ALJ failed to acknowledge that she was attending treatment at least four days per week since September 2013. However, at page 16 in the Record, the ALJ specifically refers to Plaintiff's partial hospitalization "due to symptoms of PTSD, depression, hypomania and anxiety," and her treatment by Ms. Guadagnino. R. 16. The ALJ's decision also discusses the progress notes and her participation "in the Rochester Rehabilitation Program from July 2013 until May 2014 due to cocaine abuse relapse." R. 17. Although Plaintiff argues that the reason for her admission was mischaracterized by the ALJ, the narrative portion of the report of her admission states in part as follows:

> Patricia also has a long history of drug abuse and has been involved in both inpatient and outpatient programs. She had a period of abstinence for 4 years and recently experienced a relapse resulting in her being referred to Strong PHP after her daughter discovered she was purchasing cocaine to be delivered to her apartment while watching her 5 year old granddaughter. Patricia last used cocaine on 08/23/13.

R. 585. Based on its review, the Court finds that the ALJ's mental RFC are supported by substantial evidence. Ms. Guadagnino's conclusion that Plaintiff was permanently disabled is not supported by her determination that Plaintiff was only moderately limited in one area of functioning. R. 465. Therefore, her conclusion does not successfully contradict the ALJ's mental RFC conclusion.

*Physical Residual Functional Capacity*

The ALJ determined that Plaintiff could perform a limited range of light work. The ALJ's limitations included the following: occasional operation of foot controls with bilateral lower extremities; no climbing, ladders, ropes and scaffolds; and no exposure to unprotected heights. R. 16. Plaintiff's testimony, however, showed far more limitations. She testified that she could not walk "that long, not at all," because of bone spurs on both of her heels. R. 45. She had surgery in 2011, but testified that "[t]hey had messed me up so bad," so she "won't let anyone touch me anymore for that." R. 45. She stated she could stand only for a couple of minutes, and "[i]t's just too much for my feet. They get swollen." R. 45. She testified that she could stoop, kneel, crouch and crawl, but not for long periods, and that she could sit for approximately 30 minutes before becoming uncomfortable, and lift three to five pounds. R. 45–46.

The ALJ relied on treatment notes from Henry Stark, DPM, to conclude that Plaintiff's reported residual functional capacity far underestimated her actual abilities. R. 16. On February 8, 2012, Dr. Stark saw Plaintiff for a post-operative checkup on the surgery he performed January 12, 2012, on Plaintiff's right foot. R. 327. Dr. Stark noted that Plaintiff was

9

complaining about pain in her left foot, so he reviewed surgical options for that foot and Plaintiff agreed to have surgery on her left foot. R. 328.

Dr. Stark performed an endoscopic plantar fasciotomy of Plaintiff's left foot at Columbia Hospital in West Palm Beach, Florida, on February 22, 2012. R. 398. In his report, Dr. Stark noted that Plaintiff had undergone a plantar fascial release on her right foot. R. 398–99. Following the procedure on her left foot, Dr. Stark's prognosis was "[g]ood for complete recovery and eradication of underlying painful plantar fasciitis of the left heel." R. 400. Dr. Stark's report does not address Plaintiff's current ability to walk.

On March 7, 2012, Dr. Stark saw Plaintiff, and noted tenderness on palpation of her left heel, and limping. He scheduled a follow up visit for two weeks. R. 326–27. On March 21, 2012, Dr. Stark saw Plaintiff and noted tenderness on palpation of her left heel, and limping. He asked Plaintiff to schedule a follow up visit if needed. R. 326.

On April 18, 2012, Dr. Stark examined Plaintiff and noted tenderness on palpation of the left heel, and limping. He used ultrasound therapeutically over the area, and scheduled a follow up visit for three months.

On May 23, 2012, Plaintiff had fallen and reported pain in her left second and third toes. R. 322. Dr. Stark noted tenderness on palpation of her left heel, as well as her toes on that foot, and that she was limping. Dr. Stark determined from an x-ray that Plaintiff had broken the base of her left second toe and bandaged it to the adjacent toe, scheduling a follow up visit in a week.

Dr. Stark's follow up examination on May 30, 2012, revealed that Plaintiff had tenderness in her left heel, that she was limping, and that she had recently fractured one of the toes of her left foot. R. 321–22.

On March 28, 2013, Harbinder Toor, M.D., performed a physical assessment for determination of employability, R. 470–74, and indicated in his report that Plaintiff "is unable to participate in any activities except treatment or rehabilitation" for three to six months "[b]ecause of pain and headaches." R. 473. He determined that her ability to walk was "very limited" to one or two hours. R. 472. Plaintiff reported that she was "in excruciating pain in the ankles, knees, and hips." R. 471. Dr. Toor's examination of Plaintiff revealed "[t]enderness and slight swelling in the ankles and knees [and] [t]enderness in the hips and wrists bilaterally." R. 472.

The Commissioner argues that the ALJ's physical RFC determination was based primarily on Dr. Stark's treatment records "viewed in combination with all other relevant evidence in the record as a whole." Comm'r Mem. 16. From the lack of further treatment records for her feet, and the activities of daily living about which Plaintiff testified, the ALJ concluded, argues the Commissioner, that Plaintiff did not further suffer from pain in her feet.

Plaintiff counters that her case parallels *McCarthy v. Colvin*, 66 F. Supp. 3d 315 (W.D.N.Y. 2014), in which the Honorable Michael A. Telesca wrote: "Rather than seek an assessment of plaintiff's functional limitations from an examining or consultative physician, the ALJ assessed plaintiff's RFC by evaluating and interpreting portions of the medical evidence himself. This was error." *McCarthy*, 66 F. Supp. 3d at 322.

According to the Commissioner's Rules, when assessing medical evidence, the Commissioner is required to "evaluate every medical opinion we receive… [and] always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 CFR 404.1527 (eff. until Mar. 27, 2017). Dr. Stark's medical opinion supports neither that Plaintiff is unable to walk, or is able to walk, for more than the time to

11

which she testified. Therefore, the ALJ's opinion must necessarily rest entirely on her assessment of Plaintiff's testimony, including the testimony about her activities of daily living:

> She testified that she lives alone in an apartment. She reported that she is able to clean her room, take care of her personal needs, take care of her dog, go groceries shopping, and wash her laundry. In her function report, she stated that she is able to take care of her personal needs with some difficulties. She reported that she is able to prepare simple meals, vacuum, fold her clothes, check mail, and go groceries shopping (Exhibit 5E). I find that the claimant's testimony and her function report do not support the finding that the claimant has such severe limitations that they would preclude her from sustaining gainful employment within her very restrictive residual functional capacity.

R. 18. Plaintiff's January 30, 2013, Function Report, R. 196–203 (Exhibit 5E) in the section Personal Care, contains, *inter alia*, the following:

> Dress: usually wear same items for about 4 days in a row.
>
> Bathe: only can shower—1x – 2x month—usually takes a long time and I sit. My son got me a shower head that can be moved with a long tube. Also use baby wipes and wash cloths—sponge bath.
>
> Care for hair: daughter cuts it & deep conditions—1x/month, sometimes 2x.
>
> Feed self: sometimes—eazy [sic] macaroni—microwavable stuff.

R. 197. Plaintiff also reported that she sometimes vacuums and folds cloths and checks mail when she has a good day, and does so for no longer than fifteen or twenty minutes. R. 198. She attributed her inability to do housework and yard work to "migraines & pain. Allergies/Environmental causes bronchitis and asthma. I get sick really easy—very weak immune system." R. 199. In addition, she reported that "[I] still use a ca[]ne if I know I will have to walk to[o] far from this past year[']s foot surgery that just seems to have made things worse." R. 202.

> Light work is defined by the Commissioner as follows:
>
> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of

walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 CFR 404.1567. As the Second Circuit observed in *Michaels v. Colvin*, 621 Fed. Appx. 35 (2d Cir. 2015)

> Light work generally requires "a good deal of walking or standing," 20 C.F.R. § 404.1567(b), "for a total of approximately 6 hours of an 8-hour workday." Titles II & XVI: Determining Capability to Do Other Work—The Med.-Vocational Rules of Appendix 2, SSR 83-10, 1983 SSR LEXIS 30, at *14, 1983 WL 31251, at *6 (1983).

*Michaels*, 621 Fed. Appx. at 40. Although the ALJ did ask Plaintiff about shopping, R. 39, she did not elicit any testimony about whether Plaintiff walks during shopping or uses a sitting cart.

From the evidence in the record, including both medical opinions by Dr. Stark and Plaintiff's testimony, the Court concludes that the ALJ's physical RFC determination is not supported by substantial evidence. Dr. Stark's progress notes do not indicate whether Plaintiff still suffers from foot pain sufficiently severe to prevent her from walking. Plaintiff's testimony likewise does not substantially support a conclusion that she could perform light work. Consequently, the ALJ's decision with regard to the physical RFC finding must be reversed, and the case remanded for a new hearing.

## CONCLUSION

The Commissioner's decision is not supported by substantial evidence and is reversed pursuant to sentence four of 42 U.S.C. § 405(g) and remanded for a new hearing.

IT IS SO ORDERED.

DATED:   April 5, 2017
         Rochester, New York

                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge